# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DAVID P. GAUGHAN,

                    Plaintiff,

v.

NEW AMERICAN FUNDING, LLC,

                    Defendant.

Case No. 23-CV-641-JPS

**ORDER**

Plaintiff David P. Gaughan ("Plaintiff"), a licensed attorney proceeding pro se, sues Defendant New American Funding, LLC ("Defendant") for alleged misconduct arising out of Plaintiff's efforts to refinance a loan. ECF No. 10 at 1 (citing ECF No. 1-1). In August 2023, the Court granted in part and denied in part Defendant's motion to dismiss Plaintiff's complaint and ordered Plaintiff to file an amended complaint as to the remaining claims. *Id.* at 25–26. In September 2023, Plaintiff did so, and at this juncture, his remaining two claims are for (1) violations of Wis. Stat. § 100.18 and (2) breach of contract. ECF No. 15 at 6–8.

Before the Court is Defendant's motion for summary judgment on both remaining claims. ECF No. 25.[1] The motion is fully briefed, ECF Nos.

---

[1] With his opposition brief, Plaintiff filed a motion for leave to submit the brief instanter. ECF No. 30. Under this District's Local Rules, because Defendant's motion for summary judgment was filed on April 1, 2024, Plaintiff's opposition brief was due on or before May 1, 2024. Civ. L.R. 56(b)(2); ECF No. 25. Plaintiff's opposition brief, filed on May 13, 2024, was therefore untimely. ECF No. 31. In his motion for leave to submit the brief instanter, Plaintiff explains that he was unable to view the motion for summary judgment electronically when Defendant emailed it to him and that he did not receive it in the mail until over a week after it was filed. ECF No. 30 at 1–2. In response to the motion for leave to submit the brief

29, 31, 33, and for the reasons set forth below, will be granted in part and denied in part. Specifically, the Court grants Defendant's motion for summary judgment as to Plaintiff's Wis. Stat. § 100.18 claim and denies it as to Plaintiff's breach of contract claim. A trial scheduling order will be entered contemporaneously with this Order.

## 1. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014)). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant.

---

instanter, Defendant argues that the Federal Rules already allow for delay attributed to the mail and that Plaintiff has failed to meet his burden to demonstrate excusable neglect for his untimely extension request. ECF No. 35 at 1–2 (citing Fed. R. Civ. P. 5(b)(C), 6(d), and 6(b)(1)(B), and Civ. L.R. 56(b)(1)).

The Court finds Plaintiff's explanation in the motion for leave to file the brief instanter adequate to meet the excusable neglect standard, particularly considering Plaintiff's consistent prosecution of this case and the minimal prejudice to Defendant. With the three-day grace period allowed under Rule 6(d), Plaintiff's opposition brief was submitted only one week late, and he filed it instanter instead of asking for an extension. *See Postle v. Bath & Body Works, LLC*, No. 13CV50374, 2015 WL 521365, at *4 (N.D. Ill. Feb. 9, 2015) (weighing two-week delay in filing brief against the fact that it was filed instanter, together with other excusable neglect factors). Therefore, the Court will grant Plaintiff's motion for leave to file his opposition brief instanter, ECF No. 30, and the Court will consider all the briefing before it in reaching its decision on the underlying motion for summary judgment, ECF No. 25.

*Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255 and *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 505 (7th Cir. 2010)).

## 2.     RELEVANT FACTS[2]

On April 30, 2018, Defendant extended—and is the servicer for—a mortgage loan to Plaintiff in the original principal amount of $318,000 (the "Existing NAF Loan") secured by a mortgage recorded against a property in Twin Lakes, Wisconsin (the "Property"). Plaintiff also owned property in Chicago, Illinois (the "Chicago Property"), which secured a mortgage loan extended by Republic Mortgage, Inc. to Plaintiff, and others, on May 27, 2004 in the amount of $333,700 (the "Chicago Loan"). Plaintiff entered into a Home Affordable Modification Agreement with OneWest Bank

---

[2]The parties submitted a stipulated statement of undisputed facts. ECF No. 26. For purposes of Defendant's motion for summary judgment, the Court will adopt those stipulated facts that are material, with minor, non-substantive edits. Citations to the statement of undisputed facts, and internal citations therein, are omitted for brevity. Where the Court draws from the record to fill in gaps in the narrative, citations are included.

Plaintiff and Defendant also each filed a set of itemized disputed facts. ECF No. 27. Plaintiff thereafter filed an additional set of itemized disputed facts, ECF No. 32, to which Defendant responded (and included therein a response to Plaintiff's original set of disputed facts), ECF No. 34. The Court will note those disputes where applicable in the Analysis section, and it will incorporate those relevant facts that are undisputed in the Relevant Facts section. In accordance with its pretrial order, ECF No. 11 at 9, the Court disregards any facts introduced in the parties' briefing that are not set forth in the statements of undisputed or disputed facts.

Mortgage Servicing concerning the Chicago Loan effective July 1, 2016 (the "Chicago Loan Modification").

Defendant routinely communicates and markets to its existing customers opportunities to refinance their current loans with Defendant. Defendant reached out to Plaintiff on numerous occasions in 2020 by both phone and email concerning the potential for refinancing the Existing NAF Loan. For example, in November 2020, Defendant emailed Plaintiff seeking to "catch up about [his] current home loan," to "review [his] account," and "offer substantial savings." ECF No. 26-5 at 2. In December 2020, Plaintiff called Defendant to inquire about refinancing the Existing NAF Loan.

On or about December 29, 2020, Defendant initiated a refinance application for the Existing NAF Loan. Defendant sent Plaintiff disclosures on December 31, 2020, including a "Loan Estimate Disclosure." According to the Loan Estimate Disclosure, the estimated terms for a potential refinance of the Existing NAF Loan included a 2.875% interest rate, a loan amount of $310,000, closing costs in the amount of $4,835, and origination charges in the amount of $1,629. On December 31, 2020, Plaintiff signed and submitted to Defendant several related authorization and verification forms. ECF No. 34 at 1. The same day, Defendant sent Plaintiff a "Notice of Incomplete Application." *Id.* Plaintiff submitted all the necessary documents requested in the "Notice of Incomplete Application." *Id.* at 2. Defendant ran Plaintiff's credit and began verifying his information on December 29, 2020. *Id.*

On January 15, 2021, Jay Dao ("Dao"), a Senior Loan Consultant with Defendant, emailed Plaintiff that "underwriting found there was rental income in 2019 returns, therefor [sic] we cannot consider this a 2d home. If you qualify and still want to proceed, I can do the loan but the fees would

go up by $6757. Do you want to proceed?" ECF No. 26-1 at 4. Plaintiff responded the same day to clarify that, although he had "d[one] some short term rentals," "[he] did not use a management company," "always maintained control," and "used the house as a second home." ECF No. 26-15 at 7. Dao responded to Plaintiff, "Ok I have a note out to the underwriter." ECF No. 26-1 at 39. Dao later emailed Plaintiff the same day, stating, "I can call [you] back today as I should underwriting [sic] decision today." *Id.* at 40–41.

On Friday, January 22, 2021, Plaintiff asked Dao for updates, and Dao responded, stating, "Yes I'm having a zoom meeting with the u/w in your file. This is a secondary home, I just need to make the income work." ECF No. 26-15 at 6. Plaintiff responded to Dao the same day, writing, "Let me know if you need anything. Remember if it's close I can knock $200 off the monthly payment on the other property by catching up the escrow. If push really came to shove I can pay off the car and eliminate $345 a month." *Id.* Dao responded the same day, saying, "Thank you for letting me know those options. I will get back to you today." *Id.* at 5.

The following Monday, January 25, 2021, Plaintiff emailed Dao, saying, "Please verify that I am approved. Someone from Guaranteed Rate[, Inc.] [('Guaranteed Rate')] contacted me and I want to make sure I'm approved before I tell him not to proceed. What's the next step?" *Id.* Dao responded the same day, writing, "Your loan is good and approved. That was the good news I wanted to share Friday." *Id.* Plaintiff asked Dao for next steps, and Dao informed Plaintiff that he would "send[] . . . docs soon" and "reach out." ECF No. 26-1 at 37.

Later that day, Plaintiff emailed Dao, asking, "[w]ill we be able to close the first or second week of February?" *Id.* at 36. Dao responded,

"[T]here is 0% we close first or 2nd week of feb. Due to covid delays across the industry, we are looking at late February AT BEST. Other wise [sic] closing will be sometime in March." *Id.* at 35. Plaintiff responded the same day, writing,

> Jay I'm sticking with you either way. You contacted me first and I know you worked hard. If we can close by Feb. 15 that would be great but I'm going with you either way. I don't know if it was the credit check or what but I've been getting a bunch of solicitations since I applied with you. One of them was the original broker I worked with two years ago who is now with [G]uaranteed [R]ate. Do your best and I'm sticking with you. Thanks.

Plaintiff claims and testified that he and Defendant reached an agreement for the approval of his application to refinance the Existing NAF Loan verbally on January 22, 2021, which was subsequently confirmed by email on January 25, 2021 (the "Alleged Contract"). Plaintiff further testified that he understood that the terms of the Alleged Contract were "fixed" as of January 25, 2021.

In interrogatory responses, Plaintiff averred that the terms of the Alleged Contract included "[a]pplication fee waived/paid by [Defendant] for [Plaintiff]. $311,000.00 30 year fixed rate loan with an interest rate of 2.625%.[3] [Lender credit] $977 plus title/closing costs of $[2,716.00]. Closing in March 2021." In the same interrogatory responses, Plaintiff wrote that his claimed consideration for the Alleged Contract was that Plaintiff "did not pursue or continue to pursue a loan with another lender; did not pursue a loan with [Defendant] or another lender for a lesser amount; did not pursue

---

[3]Plaintiff pleads that, contemporaneous with this email, Dao represented to Plaintiff that Dao "was able to get [P]laintiff a better 30 year fixed rate of 2.625%." ECF No. 15 at 3 (citing ECF No. 15-1 at 11).

with [Defendant] or another lender paying points to reduce the interest rate which would lower the monthly payment improving [P]laintiff's debt to income ratio."[4]

On January 25, 2021, Dao and Plaintiff exchanged additional emails after Dao's "good and approved" email, including an email from Dao to Plaintiff with a screenshot of the "Fannie Mae" "Desktop Underwriter" indicating the recommendation for "Approve/Eligible" for the Loan Application. Dao further explained in this email:

> In case you were wondering why it isn't a quick approval, please see screenshot of your approval below. This is me milking every dollar possible AND getting an exception to only use 2019 returns. If we average 2018 and 2019, you wouldn't qualify due to your 2018 income being under 40k. Please note Max Debt Ratio can only be 50%. You are at 49.50% and that is with you paying down your car to under $3400 balance AND fixing your escrow shortage. Your required forms and docs will follow. I felt it prudent to show you this.

Beginning on December 30, 2020 and concurrently with his communications with Defendant about refinancing the Existing NAF Loan, Plaintiff was communicating with Guaranteed Rate in pursuit of a loan application to refinance the Existing NAF Loan. On January 25, 2021, at 10:21 am, Plaintiff sent Brian Augustine ("Augustine") of Guaranteed Rate an email stating,

> Brian, Thanks for your help but I got a call late Friday from [Defendant] that I am approved so I'm gonna go with them[.] When you called me I said I had applied with them and

_____

[4]Plaintiff has since supplemented the interrogatory responses "to include 1. paying off the escrow shortage on the Chicago [P]roperty," "2. foregoing renting the unit he occupied in the Chicago [P]roperty to increase his income," and "3. foregoing [f]iling his 2020 taxes in consultation with an accountant and being less aggressive in his deductions." ECF No. 31 at 16 n.1.

would go with whoever could get it done first. I will keep you in mind for future referrals. Thanks again Brian.

That same day, Augustine replied, "Dave, Do you mean you are closing? You are already approved with us! Just need to sign loan docs. Are you sure Dave?" Plaintiff responded to Augustine, stating, "Your email this morning said you are preparing the file for underwriting? How can I be approved if the file hasn't gone to underwriting?" Augustine responded, "Approved via automated underwriting. Locked. You are basically doing a no cost refi with us at 2.875. Let us know if you want us to send to underwrite to validate the findings, it takes about 24 hours for UW to review once subbed to them." Plaintiff replied to Augustine, stating: "I'll stick with New American. I don't want to waste your time. I will refer you though. Thanks."

On the evening of January 25, 2021, after the Alleged Contract was purportedly confirmed by Dao's "good and approved" email, Plaintiff emailed Augustine and stated, "Go ahead and submit the loan. The guy from New American called me this evening looking for more information and telling me 'he' approved the loan . . . ."

On January 27, 2021, Plaintiff electronically signed and submitted his application with Guaranteed Rate to refinance the Existing NAF Loan (the "Guaranteed Rate Application"). On February 11, 2021, Augustine informed Plaintiff that Plaintiff did not qualify for the loan being considered under the Guaranteed Rate Application. ECF No. 26-9 at 2. Plaintiff agreed to withdraw the Guaranteed Rate Application.

On or about January 27, 2021, Defendant sent Plaintiff disclosures concerning Plaintiff's request to refinance the Existing NAF Loan. Included in these disclosures was a form titled "Borrower's Certification &

Authorization," which Plaintiff executed on January 27, 2021. Per the "Borrower's Certification & Authorization," Plaintiff certified, in part, that: "[I] understand and agree that [Defendant] reserves the right to change the mortgage loan review process to a full documentation program. This may include verifying the information provided on the application with the employer and/or the financial institution." In the "Borrower's Certification & Authorization," Plaintiff also authorized the release of information from third-parties to facilitate his application to refinance the Existing NAF Loan, including the statement that: "As part of the application process, [Defendant] may verify information contained in [Plaintiff's] loan application and in other documents required in connection with the loan, either before the loan is closed or as part of its quality control program."

Also included in the January 27, 2021 disclosures was a new "Loan Estimate Disclosure." According to the new Loan Estimate Disclosure, the estimated terms for a potential refinance of the Existing NAF Loan included a 2.625% interest rate, an original principal loan amount of $311,000, closing costs in the amount of $5,228, and origination charges in the amount of $1,629. Plaintiff signed and submitted a "Uniform Residential Loan Application" aligning with these terms on January 28, 2021. ECF No. 26-1 at 45–50.

Defendant's records show that on February 6, 2021, one of its underwriters, Pamela Bailey ("Bailey"), entered the comment "unable to proceed as 2nd home as borrower claims the subject property a rental on his 1040s." ECF No. 34 at 2. Defendant requested additional information and documents from Plaintiff on multiple occasions after the disclosures provided on January 27, 2021. On February 11, 2021, Defendant requested a copy of the Chicago Loan Modification. Defendant's records include a

note dated February 15, 2021 stating, "UW wants to remove the 'dispute' verbage [sic] from old loan. Working on that now." Plaintiff provided Defendant with a copy of the Chicago Loan Modification on March 5, 2021. Defendant's records show a March 5, 2021 note stating, "dispute removed."

On March 5, 2021, Dao emailed Plaintiff stating, "Underwriting confirmed it's a Fannie and Freddie Guideline added during COVID." Plaintiff has not located any Fannie and Freddie Guideline added during the COVID-19 pandemic that would require Defendant to request the Chicago Loan Modification. ECF No. 34 at 4. On March 10, 2021, Dao sent an email to other employees of Defendant stating,

> Hello Team, Credit has been cleared of disputes and [the Chicago Loan Modification] agreement is in the file. Can you please advise why income was cut? I did some due diligence on this file with Lisa for income at the beginning. AUS only requires one most recent year of income. I've included that email. Can this be reviewed now? Thank you??

On March 12, 2021, Bailey replied to Dao's email, writing,

> Hi Jay. I just tried to call you. I haven't heard back from her yet, but I did a little research. I'm afraid she may have inadvertently pulled the wrong figure. Per our Sam worksheet (attached), we must deduct Meals from the borrower[']s income. Doing so reduces the borrower[']s income to $4,561.92, giving us a 68.134% DTI. This is resulting in refer DU findings. I'm attaching the updated 1008 for your review, and am sending the loan back to processing to restructure. Please let me know if you have any questions. Thanks!

Defendant admits that it incorrectly calculated Plaintiff's income. ECF No. 34 at 2. On March 15, 2021 Dao emailed Plaintiff, stating,

> It seems I keep coming into hurdles on this loan. No[w] we are faced with the issue of having to adjust your debt ratio due to the future payment of your loan Mod agreement. As

you recall, we were on the brink of qualifying to begin with. I'm trying to navigate these waters.

On March 15, 2021, Plaintiff replied to Dao, writing "I caught up with the escrow shortage and with the increased interest rate I'm still less than the monthly payment I needed to be at. Can we talk tomorrow? I think I can explain the numbers. Thanks Jay." On March 16, 2021, Plaintiff emailed Dao, stating "My property taxes on my house with the loan modification went down 12% which is $91 a month—almost a wash on the increase in payment starting in June per the modification. I can send the assessor's paperwork when I get back to the office. Thanks." Later the same day, Plaintiff again emailed Dao, writing,

> Here are the documents showing that my taxes were reduced on [the Chicago Property]. In Cook County we are always a year behind on our property taxes. That is why I included the 2019 tax bill. That is the last full year tax bill. I will see the savings in the second installment 2020 tax bill which won't come out till the end of the summer or early fall. Hopefully our last hurdle. Give me a call to discuss . . . . Thanks for all your hard work.

On March 17, 2021, Plaintiff emailed Dao, writing, "I'm just checking in to see how things are going and to make sure you received my email with the reduced property tax information. Thanks." On March 17, 2021, Defendant's records include the note, "NO CANCEL—ETA FIX 3/22." On March 18, 2021, Dao replied to Plaintiff, stating, "Hi David I am working on it." Defendant's records show a March 24, 2021 note, stating, "Withdrawn . . . Comments: Borrower communicated to [Defendant] that they are not ready to move forward with the loan application." Plaintiff never communicated to Defendant that he did not want to proceed with refinancing the Existing NAF Loan. ECF No. 34 at 5.

On March 22, 2021, Dao emailed Plaintiff, stating,

> I have been back and forth with u/w on this. And we cannot approve you. Two things that are in issue, currently the payment is still $1736 AND the loan mod listed the payment that will take affect [sic]. Because it's an upcoming adjustment, I have to use these figures. Having accounting for all this, we cannot approve your loan at this time.

That same day, Plaintiff replied to Dao, writing, "The payment is not $1736. I had the escrow corrected. The current payment is $772.20. Take a look at the re run credit." Dao responded: "I see $772, but escrows for taxes and insurance needs [sic] to be added to liability. If I am missing something, please let me know." Plaintiff replied the same day, writing,

> You are. The [$]772 includes the escrow for insurance. The taxes without the reduction are $9,100. That's $758 plus $772 = $1530. With the tax reduction which has been approved the taxes are $8,008 = 667 plus 772 = $1439. Even if you use the new payment starting July 1 that's 790.23 plus 92 (insurance) plus 667.33 (taxes) = $1549.56 My payment was higher because the escrow was short from previous years. That has been corrected and these numbers are based on current known numbers.

On March 24, 2021, Dao emailed Plaintiff, stating,

> I just went over what's needed. Now it looks like you are short a little on income. For example, if your income was 5900/month in taxable income plus your rental unit on top, you would then be eligible. This has to be backed up with 1040s and 3 months business bank accts supporting income along with audited or unaudited P&L.

On March 29, 2021, Plaintiff tendered a letter to Defendant demanding that Defendant close on his refinance loan application. On April 9, 2021, Defendant's counsel responded to Plaintiff's letter and further detailed the reason for the denial of the application to refinance the Existing NAF Loan.

Plaintiff did not attempt to apply with any other lender following Defendant's denial of his application to refinance the Existing NAF Loan. Plaintiff's claim for actual damages on both his remaining claims is the difference between the monthly payments of principal and interest on the Existing NAF Loan and what Plaintiff claims to be the principal and interest payments if the Existing NAF Loan had been refinanced at 2.625%, amortized over 30 years, and the lost opportunity to use and invest this difference in loan payments.

3.    **ANALYSIS**

    **3.1    Breach of Contract**

The Court begins with Plaintiff's claim for breach of contract. "The elements for a breach of contract in Wisconsin are familiar; the plaintiff must show a valid contract that the defendant breached and damages flowing from that breach." *Matthews v. Wis. Energy Corp. Inc.*, 534 F.3d 547, 553 (7th Cir. 2008) (citing *Nw. Motor Car, Inc. v. Pope*, 187 N.W.2d 200, 203 (Wis. 1971)). A valid contract must be supported by an "offer, acceptance, and consideration." *Runzheimer Int'l, Ltd. v. Friedlen*, 862 N.W.2d 879, ¶ 20 (Wis. 2015) (citing *Rosecky v. Schissel*, 833 N.W.2d 634, ¶ 57 (Wis. 2013)).

Regulation Z, the implementing regulation for the Truth in Lending Act, 15 U.S.C. § 1601 et seq., defines "consummation" of a loan as "the time that a consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 1026.2(a)(13). The official commentary provides that

> [w]hen a contractual obligation on the consumer's part is created is a matter to be determined under applicable law; Regulation Z does not make this determination. A contractual commitment agreement, for example, that under applicable law binds the consumer to the credit terms would be consummation.

Case 2:23-cv-00641-JPS    Filed 09/24/24    Page 13 of 30    Document 36

*Id.*, Supplement I, Commentary 2(a)(13), Consummation. Reviewing this provision, the Second Circuit concluded under similar facts that, because New York law provides that "the consumer's acceptance of a lender's commitment offer constitutes a binding contract" and "[f]or such a commitment contract to exist it is only necessary that the borrower and lender concur as to the essential terms of the future mortgage transaction," the contract was valid and binding. *Murphy v. Empire of Am.*, 746 F.2d 931, 934 (2d Cir. 1984) (citing Regulation Z, Supplement I, Commentary 2(a)(13) (at p. 684 of 12 C.F.R. Parts 200–299 (1984), *Avalon Constr. Corp. v. Kirch Holding Co.*, 175 N.E. 651, 652 (N.Y. 1931), *Zelazny v. Pilgrim Funding Corp.*, 244 N.Y.S.2d 810, 816 (Nassau Cnty. 1963), and *Dubin Weston, Inc. v. Louis Capano & Sons, Inc.*, 394 F. Supp. 146, 155 (D. Del. 1975)).

As the Court explained in its order granting in part and denying in part Defendant's motion to dismiss, like under New York law, breach of contract claims like Plaintiff's are cognizable under Wisconsin law. ECF No. 10 at 21–22 n.5. In *Hardscrabble Ski Area, Incorporated. v. First National Bank of Rice Lake*, the Wisconsin Supreme Court reviewed a similar set of facts to those here. 166 N.W.2d 191 (Wis. 1969). There, the plaintiff contacted the Small Business Administration ("SBA") for a loan to make improvements to his company and to install equipment for making artificial snow. *Id.* at 193. He then contacted the defendant bank to see whether it would extend part of the loan. *Id.* The defendant bank agreed, and the plaintiff submitted his application to the SBA, ordered the snow-making equipment, and arranged for installation and delivery of the equipment. *Id.* at 193–94. The SBA later contacted the defendant bank to convey its opinion that the plaintiff needed a higher loan and inquiring whether the defendant bank would participate given the increase. *Id.* at 194. The defendant bank agreed,

and the SBA approved the loan. *Id.* The equipment arrived and was held in storage pending completion of documents by the defendant bank, which needed to be sent to the SBA. *Id.* The defendant bank delayed completing the documents, and by the time the equipment was released, the plaintiff was unable to timely install it for the ski season and suffered financial loss as a result. *Id.*

On review of the defendant bank's motion for summary judgment, the court was faced with competing affidavits. The defendant bank said that it had never commented, promised, or represented to the plaintiff when it would make the loan and, if made, when the loan would be closed. *Id.* Conversely, the plaintiff said that he had many conversations with the defendant bank regarding timing and that the defendant bank had reassured him multiple times that timing would not be an issue. *Id.* The court found that it could not resolve the factual conflict on summary judgment and that the breach of contract claim would proceed. *Id.* at 196–97. It further declared that the rule in Wisconsin is that "a bank may sustain liability as a result of a failure to lend money in accordance with a contract into which it has entered." *Id.* at 196 (citing 7 Am. Jur., Banks, § 646). On the facts presented, the court found an offer, an acceptance, and consideration because "it is possible for a change of financial position to the borrower's disadvantage to constitute a consideration for a contract, if this situation is fully known to the lender." *Id.* at 196.

Years later, in *Schwartz v. Federated Realty Group, Incorporated*, the Wisconsin Court of Appeals confronted similar facts to those here and in *Hardscrabble*. 436 N.W.2d 34 (Wis. Ct. App. 1988). There, the plaintiffs applied for a mortgage loan with the defendant lender. *Id.* at 34. The plaintiffs paid a nonrefundable application fee and communicated the

closing date for the associated real estate purchase—upon which obtaining a mortgage loan was contingent—to the lender. *Id.* at 34–35. The plaintiffs provided financial information with their application and thereafter contacted the defendant lender several times to inquire whether any additional information was needed. *Id.* at 35. The defendant lender told the plaintiffs that all information had been received and that they should expect a decision within several days. *Id.* Relying on these representations, the plaintiffs vacated their prior home and prepared for the real estate closing. *Id.* Three days before closing, the defendant lender requested tax returns from the plaintiffs, which they were not able to provide in time. *Id.* The closing did not take place, and the plaintiffs forfeited their earnest money. *Id.*

The court summarized *Hardscrabble* as "hold[ing] that the type of action alleged by the [plaintiffs], if properly pled, sounds in contract." *Id.* (citing *Kukuska v. Home Mut. Hail-Tornado Ins. Co.*, 235 N.W. 403, 405 (Wis. 1931)). The court agreed with the defendant that it never agreed to make a mortgage loan to the plaintiffs; however, the court framed the complaint instead as one for breach of an "agreement between the parties . . . for a timely processing of the application in light of [the defendant's] awareness of the closing deadline and its reassurances to the [plaintiffs] that all requisite information was in hand." *Id.* Although the parties did not enter into a written agreement, the circumstances of their exchanges created an implied contract in fact. *Id.* at 35–36 ("*Kukuska* is particularly instructive because it holds that under certain circumstances and absent a written agreement, an *application* can create a contractual duty to act with dispatch.") (citing *Kukuska*, 235 N.W. at 405 and *Theuerkauf v. Sutton*, 306 N.W.2d 651, 656 (Wis. 1981)). Under the facts at bar, where the defendant

accepted the plaintiffs' mortgage loan application and fee with knowledge of the pertinent term—the impending closing date—and gave assurances that all requisite information was received, the plaintiffs adequately stated a claim for breach of contract. *Id.* at 36.

Since *Hardscrabble* and *Schwartz*, the Wisconsin Court of Appeals has again reiterated that a lender may be liable in contract for failing to lend money that it had agreed to lend. *See Goossen v. Est. of Standaert*, 525 N.W.2d 314, 318 (Wis. Ct. App. 1994) ("The elements of an enforceable contract, 'offer,' 'acceptance' and 'consideration' are present: The [plaintiffs] offered to borrow money, the bank accepted their offer by processing the loan, and the [plaintiffs] provided consideration by paying the bank a loan origination fee.") (citing *NBZ, Inc. v. Pilarski*, 520 N.W.2d 93, 96 (Wis. Ct. App. 1994)).

Citing *Hardscrabble*, *Schwartz*, and *Goosen*, the Court concluded when it granted in part and denied in part Defendant's motion to dismiss that "Plaintiff alleges that his loan application was the offer, Dao's emails regarding approval and closing were the acceptance, and Plaintiff's refusal to entertain other offers, allegedly to his detriment, is sufficient to plead consideration." ECF No. 10 at 23 n.5. In its motion for summary judgment, Defendant argues that discovery has revealed that Plaintiff is unable to show the existence of a valid contract because (1) the terms of the Alleged Contract were not definite, (2) the Alleged Contract lacked consideration, (3) the Alleged Contract was an unexecuted bilateral agreement, (4) the Alleged Contract was against public policy, and (5) any oral agreements as to the Alleged Contract are barred by the statute of frauds. ECF No. 29 at 12–13. None of these arguments persuades the Court that its prior holding was incorrect, nor are these arguments successful on summary judgment.

First, Defendant argues that the Alleged Contract was merely a preliminary agreement to refinance the Existing NAF Loan because "at the time of the Alleged Contract, Plaintiff had not even submitted a loan application to [Defendant]." *Id.* at 14. Plaintiff pleads in the amended complaint that he "formally applied for the refinance in the first week of January 2021," well before Dao's "good and approved" email on January 25, 2021. ECF No. 15 at 2. Recall that Plaintiff also pleads—and the Court found in its prior order—that the "good and approved" email, together with the subsequent emails regarding the closing timeline, constituted Defendant's acceptance of the Alleged Contract. ECF No. 10 at 22–23 n.5. Discovery has revealed that Plaintiff did not formally apply to refinance the Existing NAF Loan until January 28, 2021. ECF No. 27 at 2; ECF No. 26-1 at 45–50. As a result of this discrepancy, and the fact that Plaintiff did not receive an application and disclosures reflecting Plaintiff's understanding of the terms of the Alleged Contract until *after* the acceptance emails, Defendant contends that the terms of the Alleged Contract were indefinite at the contract forming moment. ECF No. 29 at 15–16.

However, first, Defendant does not point to any authority holding that an offer needs to be in the form of a written loan application, and *Hardscrabble*, *Schwartz*, and *Goosen* do not so hold. In fact, the authority Defendant *does* cite—that the December 31, 2020 disclosures that it provided to Plaintiff are required "prior to proceeding with the review of *a consumer's application* under the Truth in Lending Act . . . and its implementing regulation"—suggests that it viewed Plaintiff as having applied at that time. ECF No. 29 at 15 (emphasis added). Defendant also consistently refers to December 30, 2020 as the date of "Plaintiff's application." *See, e.g.*, ECF No. 27 at 2.

In any event, second, it is undisputed that Defendant sent Plaintiff disclosures on December 31, 2020 with estimated terms to refinance the Existing NAF Loan with a 2.875% interest rate, a loan amount of $310,000, closing costs in the amount of $4,835, and origination charges in the amount of $1,629. The same day, Plaintiff signed and submitted to Defendant several forms indicating his intent to proceed with refinancing the Existing NAF Loan. The fact that the terms reflected in the application and disclosures that Defendant sent to Plaintiff after acceptance—which included, for example, a 2.625% interest rate—are slightly different does not mean that the terms were indefinite at the contract forming moment, particularly given, as discussed *infra*, the parties' clear intent to contract here. *See Herder Hallmark Consultants, Inc. v. Regnier Consulting Grp., Inc.*, 685 N.W.2d 564, ¶ 10 (Wis. Ct. App. 2004) ("[W]e may discern a contract where the parties' conduct evidences sufficient definiteness of an intent to contract, even if an essential term is left vague or indefinite."). For both of these reasons, Defendant's argument fails.

Next, Defendant argues that, following discovery, Plaintiff is no longer able to present evidence of consideration for the Alleged Contract because "he did not forbear from pursuing alternative financing" given his "additional application for refinance with Guaranteed Rate." ECF No. 29 at 17. Although this was the consideration that the Court found in its prior order, ECF No. 10 at 23 n.5, Plaintiff *also* pleads in the amended complaint that he "agree[d] to pay down his car payment to satisfy his debt to income ratio" and that he "inform[ed] Dao that he could reduce his other mortgage payment by $200.00 per month by paying his property tax escrow shortage on his other mortgage payment." ECF No. 15 at 2. Dao's January 25, 2021 email to Plaintiff explaining that he had to use Plaintiff "paying down [his]

car . . . AND fixing [his] escrow shortage" in order for Plaintiff to qualify is sufficient to create a genuine dispute of fact on the issue of consideration. *See Hardscrabble*, 166 N.W.2d at 197. Importantly, while Defendant contends that Plaintiff raises this notion "for the first time" in his opposition brief, the record flatly contradicts that assertion. ECF No. 33 at 8. Plaintiff pleaded the pertinent facts in his amended complaint, and the fact was included as a disputed fact with *Defendant's* own submissions at the time the summary judgment motion was filed. ECF No. 27 at 4.

Defendant's third argument, that the Alleged Contract is a mere unexecuted bilateral contract because it "rests solely upon the future performance of . . . Plaintiff and [Defendant]," is also unsuccessful. ECF No. 29 at 19. Defendant cites *First Wisconsin National Bank of Milwaukee v. Oby*, where the parties entered a contract whereby "the plaintiff [bank] would make available to [the] defendant and her husband a line of credit . . . which they could draw upon by using special check forms provided by [the] plaintiff." 188 N.W.2d 454, 455 (Wis. 1971). The contract included a termination clause providing that it could "be terminated at any time by either party." *Id.* at 456. The plaintiff honored eleven checks, but at a certain point, the defendant and her husband failed to make payments. *Id.* While the contract was executory at the time of execution, at the time the action was brought, "the plaintiff had fully or partially executed the act which formed the basis for the defendant's promise," which rendered its promise "no longer . . . executory and illusory . . . but . . . executed [and] sufficient consideration." *Id.* at 458–59. The termination clause did not override that fact. *Id.* at 456.

The same is true here; at a minimum, Plaintiff avers that he caught up on his escrow shortage and emailed Dao paperwork proving the same.

ECF No. 26-21 at 2-3. Again, Dao's January 25, 2021 email explaining this necessity in order to qualify for the refinance is sufficient to create a genuine issue of material fact on the issue of consideration, even considered together with the fact that the loan disclosures that Defendant provided to Plaintiff informed him that he "d[id] not have to accept th[e] loan because [he had] signed or received th[e] form." ECF No. 29 at 19 (quoting ECF No. 26-1 at 56).

Fourth, Defendant argues that the Alleged Contract is against public policy because adhering to it "would require that [Defendant] violate the ability-to-repay rule ('ATR Rule') enacted by Regulation Z." *Id.* at 15. The ATR Rule provides that "[a] creditor shall not make a loan . . . unless the creditor makes a reasonable and good faith determination at or before consummation that the consumer will have a reasonable ability to repay the loan according to its terms." 12 C.F.R. § 1026.43(c)(1). This determination requires the creditor to consider, inter alia, "[t]he consumer's current or reasonably expected income or assets," "[t]he consumer's monthly payment for mortgage-related obligations," and "[t]he consumer's monthly debt-to-income ratio." 12 C.F.R. § 1026.43(c)(2).

As a disputed fact, Defendant proffers that, as of January 25, 2021 (the date of the "good and approved" email), it "had not verified the information contained in Plaintiff's December 30, 2020 application" and it "had not completed its review of . . . Plaintiff's application or approved the application to proceed with closing." ECF No. 27 at 2. It also submits as a disputed fact that its "underwriters . . . did not begin the review of the Refinance Application until after receipt of the executed Refinance Application" on January 28, 2021. *Id.* at 2–3. Defendant further argues that Dao's January 25, 2021 "good and approved" email was generated based

on the "Fannie May Desktop Underwriting Program" without independent underwriter verification. ECF No. 29 at 21.

These facts are contradicted by the record, making summary judgment for Defendant inappropriate on this basis. For example, Dao referred to a "note out to the underwriter" in a January 15, 2021 email, as well as a "decision" from underwriting later that same day. He also referred to a "zoom meeting with the u/w" on January 22, 2021. These communications logically could not have been with a program and, moreover, suggest that underwriting review of Plaintiff's application was well underway, if not complete, at the time of the "good and approved" email. While one email from Dao sent after the "good and approved" email included a screenshot from the "Fannie May Desktop Underwriting Program," this is insufficient to carry Defendant's public policy argument across the finish line in the face of the record as a whole.

Fifth and finally, Defendant asserts that the statute of frauds set forth in Wis. Stat. §§ 706.001(1) and 706.02(1) bars the Alleged Contract. ECF No. 29 at 22. Those provisions provide that "every transaction by which any interest in land is . . . mortgaged" is invalid unless "evidenced by a conveyance that satisfies all of the following":

(a) Identifies the parties; and

(b) Identifies the land; and

(c) Identifies the interest conveyed, and any material term, condition, reservation, exception or contingency upon which the interest is to arise, continue or be extinguished, limited or encumbered; and

(d) Is signed by or on behalf of each of the grantors; and

(e) Is signed by or on behalf of all parties, if a lease or contract to convey; and

. . . .

Case 2:23-cv-00641-JPS    Filed 09/24/24    Page 22 of 30    Document 36

(g) Is delivered.

A conveyance may satisfy the above-listed requirements "[b]y several writings which show expressly on their faces that they refer to the same transaction, and which the parties have mutually acknowledged by conduct or agreement as evidences of the transaction." Wis. Stat. § 706.02(c).

Preliminarily, Defendant has waived the statute of frauds affirmative defense because Defendant did not plead the defense in its answer to the amended complaint. ECF No. 16; ECF No. 29 at 22 (arguing that Defendant raises the statute of frauds "as an affirmative defense") (citing *Supeview Network, Inc. v. SuperAmerica, a Div. of Ashland Oil, Inc.*, 827 F. Supp. 1392 (E.D. Wis. 1993)); *see also Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921, 928 (7th Cir. 1991) (holding that the statute of frauds is an affirmative defense which, as a general matter, must be pleaded to avoid waiver thereof) (citing *De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 334 (7th Cir. 1987) and *Bull's Corner Rest., Inc. v. Dir. of Fed. Emergency Mgmt. Agency*, 759 F.2d 500, 502 (5th Cir. 1985)). Although Defendant raised the defense in the motion for summary judgment itself, allowing Plaintiff an "attempt to respond," Plaintiff "was still at a serious disadvantage [because] [t]he notice came after the parties had completed discovery." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 482 (7th Cir. 2019) (citing *Venters v. City of Delphi*, 123 F.3d 956, 967–69 (7th Cir. 1997)).

Even if the defense were not waived, however, the argument is unavailing. Defendant argues that the Alleged Contract fails under the statute of frauds because "there is no written memorandum of the agreement which contains or incorporates all of the material terms." ECF No. 29 at 22. Defendant again contends that the December 31, 2020

disclosures included slightly different terms than those that Plaintiff understood to have been accepted by the "good and approved" email. *Id.* at 23. Moreover, Plaintiff—as the "grantor" in this transaction—did not sign and return an application with the December 31, 2020 disclosures, as he only formally applied on January 28, 2021. *Id.*

Nonetheless, Plaintiff did sign and return several forms in connection with the December 31, 2020 loan disclosures. When he received a "Notice of Incomplete Application," he submitted further documentation. He then exchanged weeks—if not months—worth of emails with Dao regarding the underwriting process and commemoration of Plaintiff's statements that he was willing to pay off his car and escrow shortage. The January 25, 2021 "good and approved" email was followed two days later with loan disclosures reflecting the exact terms that Plaintiff understood to have been accepted by the email, and which Plaintiff signed and returned on January 28, 2021. Together, these writings are sufficient to satisfy the statute of frauds under § 706.02(c). *See Kovarik v. Vesely*, 89 N.W.2d 279, 283 (Wis. 1958) ("The fact that the buyers' mortgage loan application came into existence subsequent to the date on which the contract was signed by the parties is . . . immaterial.") (collecting sources). Even if the "good and approved" email were read in a vacuum with only the preceding communications and the terms set forth in the December 31, 2020 disclosures, the factfinder, as discussed *infra*, "could [find] modification by conduct based on the parties' [subsequent] email exchange[s]" and the updated January 27, 2021 disclosures. *See DRM, Inc. v. BLM Land, LLC*, No. 14-CV-754-WMC, 2017 WL 3588491, at *5 (W.D. Wis. July 11, 2017) (citing Wis. Stat. § 706.02(2)(c)).

In sum, for all these reasons, the Court finds Defendant's legal arguments as to the validity of the Alleged Contract unsuccessful, and further finds that genuine disputes of material fact exist as to the matter of consideration.

Similarly, there are genuine disputes of material fact regarding whether Defendant breached the Alleged Contract. Defendant argues that, even assuming that the Alleged Contract was "fixed" and binding as of the January 25, 2021 "good and approved" email and subsequent emails regarding the closing timeline, the parties modified the contract through the January 27, 2021 disclosures. ECF No. 29 at 24–25. As part of those disclosures, Plaintiff executed the "Borrower's Certification & Authorization," in which he certified that he "underst[ood] and agree[d] that [Defendant] reserve[d] the right to change the mortgage loan review process to a full documentation program" and that "[Defendant] may verify information contained in [Plaintiff's] loan application and in other documents required in connection with the loan, either before the loan is closed or as part of its quality control program." Thus, after this "modification," Defendant claims that the Alleged Contract included an agreement between the parties that allowed Defendant "to proceed to verify the information" that Plaintiff submitted when he formally applied on January 28, 2021 before the loan was closed or as part of its quality control program. *Id.* at 25.

As the Court explained above, there are sufficient facts in the record to create, at a minimum as to breach, a genuine issue of disputed fact regarding whether the verification process was complete at the time of the "good and approved" email. A jury, assuming it finds a valid contract, must review the record to determine (1) whether the verification process was

complete at the time of the "good and approved" email and whether the subsequent verifications and requests for further documents were a result of and/or an attempt to cover up Defendant's own mistake in calculating Plaintiff's income, as Plaintiff contends, or (2) whether the parties modified the contract to allow for further verification with the January 27, 2021 disclosures. *See Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 852 (7th Cir. 2005) ("Whether a contract has been modified is a question of fact . . .") (citing *Am. Suzuki Motor Corp. v. Bill Kummer, Inc.*, 65 F.3d 1381, 1386 (7th Cir. 1995) and *Kohlenberg v. Am. Plumbing Supply Co.*, 263 N.W.2d 496, 500 (Wis. 1978)). Therefore, Defendant's motion for summary judgment on Plaintiff's breach of contract claim is denied.

### 3.2 Wis. Stat. § 100.18

Plaintiff's § 100.18 claim is, in substance, that Dao misrepresented to Plaintiff that the loan was in underwriting, then "good and approved," and then heading towards closing, upon which statements Plaintiff relied until he was later told that Dao had purportedly approved the loan himself. ECF No. 10 at 14; ECF No. 15 at 6–7.

As the Court explained at the motion to dismiss juncture, ECF No. 10 at 4, "[c]laims arising under [§ 100.18] have three required elements: '(1) the defendant made a representation to the public with the intent to induce an obligation, (2) the representation was untrue, deceptive or misleading, and (3) the representation materially induced (caused) a pecuniary loss to the plaintiff.'" *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (quoting *Novell v. Migliaccio*, 749 N.W.2d 544, ¶ 44 (Wis. 2008)). With respect to the first element, "Wisconsin courts have consistently held that 'a plaintiff remains a member of "the public" unless

Case 2:23-cv-00641-JPS    Filed 09/24/24    Page 26 of 30    Document 36

a particular relationship exists between him . . . and the defendant.'" ECF No. 10 at 4 (quoting *Chris Hinrichs & Autovation Ltd. v. DOW Chem. Co.*, 937 N.W.2d 37, ¶ 62 (Wis. 2020)). "The only clear line is that a party is not a member of the public under § 100.18 once it enters into a contract with the defendant." *Prosynthesis Lab'ys, Inc. v. Eurofins Microbiology Lab'ys, Inc.*, No. 22-CV-655-SLC, 2023 WL 3377494, at *5 (W.D. Wis. May 11, 2023) (citations omitted).

Defendant previously moved to dismiss Plaintiff's § 100.18 claim on the basis that Plaintiff was not a member of "the public" at the time of the alleged misrepresentations. ECF No. 10 at 4–6. The Court reasoned that, "while timing ultimately may become an issue for Plaintiff, at the motion to dismiss juncture, his claim survive[d]." *Id.* at 6. This was so largely because Plaintiff pleaded that Dao contacted him via a "cold call" about refinancing that "was completely separate from and had nothing to do with [the Existing NAF Loan]"; the parties had only been communicating for approximately one month at the time of the alleged misrepresentations; and several of the alleged misrepresentations took place before the contract forming moment[5] and while Plaintiff was ostensibly considering refinancing with other lenders. *Id.* at 2, 5–7.

---

[5]It bears noting that, at the motion to dismiss juncture, the Court held that it had "serious concerns regarding allowing Plaintiff to proceed on both [an] intentional misrepresentation claim and [a] breach of contract claim." ECF No. 10 at 21. The Court found Plaintiff's allegations that "he was induced to decline a separate offer (or put another way, to not withdraw his existing offer to Defendant) by Dao's allegedly intentional misrepresentations [regarding approval and the closing timeline] *and* that the same representations constituted acceptance of his offer (the loan application) and formed the contract" could not "both . . . simultaneously be true," both legally and factually. *Id.* at 10, 21–22, 23. Because Plaintiff could not "legitimately [be] in doubt about his own impressions of Dao's emails"—in other words because he "either believe[d] a contract came into

However, discovery has revealed that Defendant's contact with Plaintiff was not truly a "cold call," leading the Court to conclude that no reasonable juror could deem Plaintiff a member of "the public" at the time of the alleged misrepresentations. *See Bates v. Wisconsin-Dep't of Workforce Dev.*, 636 F. Supp. 2d 797, 811 (W.D. Wis. 2009), *aff'd*, 375 F. App'x 633 (7th Cir. 2010) (concluding on summary judgment that the undisputed facts established that the plaintiff was not a member of "the public" for purposes of § 100.18).

Defendant contacted Plaintiff numerous times by email and phone and referred in those communications to the Existing NAF Loan and opportunities to save with respect to the Existing NAF Loan. Plaintiff then contacted Defendant to follow-up on these communications. These facts remove Plaintiff from "the public" and make clear that the Existing NAF Loan was not just an "isolated" purchase or too remote "to establish a particular relationship" at the time of Defendant's outreach regarding refinancing. *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 732 N.W.2d 792, ¶ 32 (Wis. 2007); *cf. Gifford v. PHH Mortg. Corp.*, No. 18-CV-260-SLC, 2018 WL 6047061, at *7 (W.D. Wis. Nov. 19, 2018) (where the *only* communications supporting the "particular and ongoing relationship" are

existence at th[e] point [of the intentional misrepresentations] or he d[id] not"—the Court ordered Plaintiff to choose only one of the claims on which to proceed. *Id.* at 24–25. Plaintiff chose to plead the breach of contract claim in his amended complaint and omitted the intentional misrepresentation claim. ECF No. 15.

At that time, the Court only had before it the amended complaint, which, with respect to the § 100.18 claim, pleads multiple alleged misrepresentations, some of which occurred before the contract forming moment. ECF No. 10 at 6. For others, it was unclear when they occurred. *Id.* Now that discovery has been completed, there is no evidence that any of these statements took place before the contract forming moment, which removes Plaintiff from the ambit of the "public" on that independent basis as well.

the "exchange[] of [loan] disclosures," the plaintiff alleges enough facts to survive a motion to dismiss).

By way of further example, in *Bates*, the plaintiff sought the defendant's "help finding a job." 636 F. Supp. 2d at 811. The parties developed a relationship with respect to assistance finding the plaintiff employment. *Id.* Two years later, the plaintiff decided to become self-employed, and the defendant agreed to provide him with services to reach self-employment. *Id.* During these discussions, "potential misrepresentations were made about providing plaintiff funds for office space and equipment." *Id.* At that time, the plaintiff's "relationship with [the defendant] was particular enough to distinguish him from 'the public,'" and "[a]ny statements [the] defendant[] made to [the] plaintiff regarding . . . funding . . . occurred after he had accepted [the defendant's] general services . . . ." *Id.*

The facts here are materially indistinguishable from *Bates*. Discovery has made clear that Defendant's outreach regarding refinancing was related to the parties' ongoing relationship as to the Existing NAF Loan. Although refinancing is a separate service, like funding to support self-employment is separate from assistance finding employment, the language used in Defendant's communications to Plaintiff shows that those communications were based on the existing relationship. *Cf. Fricano v. Bank of Am. NA*, 875 N.W.2d 143, ¶ 30 (Wis. Ct. App. 2015) ("Presumably, if [the plaintiff] had refused the additional terms . . . the [defendant] would have moved on to the next highest bidder of the thirteen other bids that had been made. In other words, there was nothing particular about the relationship between [the parties] at that moment."). Thus, because no reasonable juror could find that Plaintiff was a member of "the public," his § 100.18 claim fails.

Defendant's motion for summary judgment is granted as to Plaintiff's § 100.18 claim.

**4.    CONCLUSION**

For the reasons explained above, the Court grants Plaintiff's motion for leave to file his summary judgment response brief instanter. ECF No. 30. The Court grants in part and denies in part Defendant's motion for summary judgment. ECF No. 25. The Court dismisses Plaintiff's claim for violations of Wis. Stat. § 100.18 with prejudice. Plaintiff's breach of contract claim will proceed to trial in accordance with the trial scheduling order entered contemporaneously with this Order.

Accordingly,

**IT IS ORDERED** that Plaintiff David P. Gaughan's motion for leave to file his summary judgment response brief instanter, ECF No. 30, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant New American Funding, LLC's motion for summary judgment, ECF No. 25, be and the same is hereby **GRANTED in part and DENIED in part**; and

**IT IS FURTHER ORDERED** that Plaintiff David P. Gaughan's claim for violations of Wis. Stat. § 100.18, ECF No. 15 at 6–7, be and the same is hereby **DISMISSED with prejudice**.

Dated at Milwaukee, Wisconsin, this 24th day of September, 2024.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge